CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED
1/24/2025
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 7:24-cr-00019 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| JAIMEKA MICHELLE AUSTIN, *et al.*, | ) | By:   Hon. Thomas T. Cullen |
| | ) |          United States District Judge |
| Defendants. | ) | |

This matter is before the court on the court's *sua sponte* notice of its intent to sever the trials of the remaining 23 defendants[1] (hereinafter, "Defendants") (ECF No. 363), Defendant Sierra Garrison's motion to dismiss the indictment or to sever (ECF No. 367), and Defendant Deshawn Lamar Johnson's motion to sever (ECF No. 370). The court convened the parties—to the extent it was able, given the sprawling nature of the indictment and the schedules of nearly 30 attorneys—on January 10, 2025, to hear argument as to whether Defendants can and should be tried at once (or in manageable groups, as the court originally envisioned), or whether they were improperly joined in a single indictment. *See* Fed. R. Crim. P. 8(b). As explained on the record and in the court's Order issued shortly after that hearing (ECF No. 384), the court is persuaded that joinder was improper. This Opinion serves to further explain the court's rationale in reaching that conclusion.

---

[1] One defendant, Millot Kevin Lexima, entered a plea of guilty on January 10, 2025. Another, Jessica Nicole Taylor, has entered into a plea agreement with the Government. (*See* ECF No. 392.)

## I.

In June 2020, the Government alleges that Defendant Jaimeka Austin ("Austin") began communicating with several people about fraudulent Paycheck Protection Program ("PPP") applications. (Indictment ¶ 34 [ECF No. 3].) Around November 2020, and continuing until approximately May 2021, Austin allegedly began a kickback scheme where she offered to submit applications and obtain fraudulent PPP loans for other individuals in exchange for payment. (*Id.* ¶ 35.) To further this scheme, Austin solicited personal information from these individuals and, if necessary, helped establish sham businesses on their behalf for an additional fee. (*Id.*) The government contends that Defendant Kiearra Gardner ("Gardner") and another unnamed co-conspirator assisted Austin with preparing and submitting many of the fraudulent applications. (*Id.* ¶ 36.) The applications submitted by Austin and Gardner on behalf of the loan applicants allegedly contained multiple materially false statements and representations about the applicant's business, financials, and proposed use of the PPP funds. (*Id.* ¶ 38.) The Government further alleges that the loan applicants each signed promissory notes attesting to the validity of the information contained in their PPP loan applications, knowing the information and such statements were false. (*Id.* ¶ 40.)

After the allegedly fraudulent loan applications were submitted, many of them were approved, and the awarded funds were deposited into accounts belonging to the respective loan applicants. (*Id.* ¶ 41.) The Government asserts that the loan applicants used the disbursed funds for unauthorized purposes, including payments to Austin for her role in securing the loans. (*Id.*) The Government estimates that at least $1,500,000 in funds were disbursed in connection with the fraudulent applications overseen by Austin. (*Id.* ¶ 45.)

On June 20, 2024, the Government filed a 142-count indictment against 24 defendants in connection with the alleged scheme. (*See generally* Indictment.) Count 1 charges both Austin and Gardner with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. (*Id.* ¶¶ 46–50.) Counts 2–82 charge all Defendants with various instances of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2(a).[2] Counts 83–110 charge 16 defendants individually with making false statements in connection with fraudulent PPP Loan Forgiveness applications, in violation of 18 U.S.C. § 1001(a)(3) and 2. Counts 111–124 charge 9 defendants with money laundering in connection with funds derived from unlawful activity including wire fraud and drug distribution, in violation of 18 U.S.C. §§ 1957 and 2. Counts 125–128 charge Austin with money laundering in connection with funds derived from unlawful activity including wire fraud and drug distribution, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2. Finally, Counts 129–142 charge 8 defendants with fraud in connection with emergency benefits based on purportedly fraudulent applications for pandemic relief unemployment benefits, in violation of 18 U.S.C. §§ 1040(a)(2) and 2.

## II.

Under Federal Rule of Criminal Procedure 8(b), an indictment "may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Separate offenses are considered acts within the same series "if they arise out of a common

---

[2] Counts 2–82 each constitute a separate charge for a discrete transmission. Austin is charged in each of these counts and Gardner is charged in many, but not all, because of their involvement with multiple applications as the alleged masterminds. While Austin and Gardner are often charged with another of the 22 defendants, when the remaining 22 defendants are charged for their individual applications in a count with someone else, it is *only* ever with Austin and/or Gardner, never with any other co-defendant.

plan or scheme . . . unified by some substantial identity of facts or participants." *United States v. Porter*, 821 F.2d 968, 972 (4th Cir. 1987). The requirements under Rule 8 are typically not "onerous" and "permit very broad joinder at the pleading stage." *United States v. Cannady*, 924 F.3d 94, 102 (4th Cir. 2019) (cleaned up).

Importantly, however, a single common hub alone is not enough to join multiple defendants. Where there is "a series of transactions involving a common denominator" the government must prove that there is a connection between the other defendants' offenses. *United States v. Whitehead*, 539 F.2d 1023, 1025 (4th Cir. 1976) (internal quotation omitted). More specifically, the "test of Rule 8(b) is not satisfied and joinder is impermissible" when "the only nexus between two defendants joined for trial is their participation in similar offenses, on different dates, with a common third defendant." *Id.* at 1026.

### III.

Twenty-two defendants in this case allegedly dealt with a common denominator—Defendants Austin and Gardner. There is no allegation that would amount to a "substantial identity of facts or participants" and allow the court to conclude that all Defendants participated in the same series of acts. Consider the facts of *Whitehead*, for example. In that case, two defendants—Whitehead and Meredith—each separately sold narcotics with a co-defendant, Jackson, to an undercover federal agent. *Id.* at 1024. These transactions occurred 13 days apart, and there was no evidence, other than that all three defendants lived in the same apartment building, that Whitehead or Meredith knew of or aided each other's independent conduct with Jackson. *Id.* The Fourth Circuit found the joinder of Whitehead and Meredith improper under Rule 8(b) because the alleged criminal conduct was independent, separate, and

"without concert of purpose" between them. *Id.* at 1023. Here, as in *Whitehead*, although Defendants are charged in crimes of the same nature (e.g., wire fraud), they are independent crimes, charged in separate counts, and which occurred on numerous different dates. The Government has alleged little factual overlap or connection among Defendants for these charges, other than their use of a common middleman operation orchestrated by Austin and Gardner.

The Government resists this conclusion, arguing that it can show the necessary connections between Defendants. For example, the Government offers that two defendants are siblings, two share a child, two are half-brothers and roommates, three are otherwise related, two had a previous romantic relationship, and various others are "friends or are otherwise linked by past criminal associations." (Gov. Response at 7 [ECF No. 366].) The Government also asserts that some defendants' businesses shared an address, some applications were submitted on the same day, some applications had identical monetary claims, and a few defendants were involved in helping or recruiting each other. The Government concludes that these demonstrated connections are sufficient to sustain the indictment against all 24 defendants.[3] The court disagrees.

For one, being friends, relatives, or past criminal associates is not sufficient to infer a connection as to the Defendants in this Indictment in this criminal case. Such social

---

[3] The Government also strenuously asserts that it could have charged all 24 defendants in a conspiracy, but, for whatever reason, it chose not to do so, and that this choice is irrelevant to the propriety of joinder under Rule 8(b). While the government has an absolute right to exercise its discretion and bring charges in the manner in which it chooses, it is difficult to reconcile an argument that such a decision is irrelevant with the fact that the government's argument relies on some evidence or inferences that all Defendants are complicit in a single overarching—uncharged—scheme.

relationships are analogous to the type of impermissible "happenstance" connections observed in *Whitehead*. *See Whitehead*, 539 F.2d at 1025. As to the other purported connections, though they are more relevant than Defendants' social and familial connections, they are simply not enough to justify the joinder of two dozen Defendants. This case is much more akin to the case of indicting together "two delinquent taxpayers who used the same accountant," a circumstance which "approaches the ridiculous." *Whitehead*, 539 F.2d at 1025.

Furthermore, contrary to the Government's argument, the court believes that this case is like that of a so-called rimless conspiracy, where, by virtue of their interaction with a common defendant, other defendants were involved in multiple separate conspiracies, as opposed to a single overarching conspiracy.[4] *See Kotteakos v. United States*, 328 U.S. 750, 754–55 (1946). In *Kotteakos*, 32 defendants were charged in a similar fraudulent loan application scheme, wherein a single co-defendant—Brown—acted as the common broker and obtained fraudulent loans for the other defendants in exchange for a commission. *Id.* at 752–54. Because the defendants had no connection between them other than that Brown was instrumental in obtaining the loans in each instance, the Supreme Court found prejudicial error in the defendants' joint trial. *See id.* at 754, 772–73, 775. In such a case, it is easy to "confuse the common purpose of a single enterprise with the several, though similar purposes of numerous separate adventures of like character." *Id.* at 768–69. While the substance of conspiracy law

---

[4] One example, which the court continues to find instructive and analogous to this case, is a common drug dealer with numerous, otherwise unrelated, buyers—in which case joinder would not be appropriate. The fact that all the buyers engaged in the same crime with a common dealer does not, by virtue of that fact alone, implicate them in a vast drug-distribution scheme with one another.

- 6 -

does not equate to the Rule 8(b) standard, it is relevant and greatly informs the court's analysis of the insufficient connection between Defendants in this case.

While this is a close question, and the court acknowledges the Government's good-faith arguments to the contrary, the court is persuaded that Defendants are improperly joined[5] in the Indictment and will sever Defendants trials.

## IV.

Beyond misjoinder—which itself necessitates severance—the court has serious concerns regarding the severe prejudice Defendants would face in a joint trial. (*See* Order at 1 n.2, Jan. 10, 2025 [ECF No. 384].) Under Federal Rule of Criminal Procedure 14(a), "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant . . . , the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Even if the joinder is proper, "if there is a serious risk that a joint trial would compromise a specific right of one of the defendants, or prevent the jury from making a reliable judgment about guilty or innocence," severance is appropriate. *Zafiro v. United States*, 506 U.S. 534, 539 (1993). As here, "[w]hen many defendants are tried together in a complex case and they have markedly different degrees of culpability, [the] risk of prejudice is heightened." *Id.* In this case, only Austin and Gardner are charged with conspiracy. Any other defendant tried alongside them would face a severe burden of uncoupling themselves from the surely copious amounts of evidence introduced against the two alleged ringleaders.[6] This

---

[5] The court stresses—as it did at oral argument—that the use of the term "improper" is a term of art and is not meant to imply any bad faith on the part of the Government.

[6] This, in turn, would require the court to give limiting instructions throughout the government's case-in-chief, as much of the evidence related to Austin's and Gardner's perpetration of a multi-faceted fraud scheme would likely be inadmissible against many individual defendants who are not alleged to have joined or participated in

would no doubt lead to jury confusion and a strong propensity for improper inferences. Moreover, the defendants tried alongside Austin and Gardner would be subject to that prejudice arbitrarily and unlike other similarly situated defendants who, for logistical reasons, would not be tried with the charged conspirators.[7] Finally, even defendants tried in groups without Austin or Gardner would likely face severe prejudice from the jury making assumptions or inferences about an uncharged conspiracy and the weight of evidence introduced unrelated to each defendant's specific crime(s).

The Government concedes that a joint trial of Defendants would present a "serious risk of compromise to the jury's factfinding abilities," but attempts to mitigate that position in part by assuring the court that most defendants will plead guilty and that the court should wait and see whether those concerns will materialize. (Gov. Response at 10–11.) In any event, the Government proposes trying "related" groups of defendants, instead of a random assortment, to further mitigate prejudice.[8] But none of these proposed measures are sufficient. Defendants must be able to properly prepare for trial and be aware of what circumstances they are facing to make informed strategic decisions going forward. Accordingly, the court cannot ensure that Defendants receive the fair trial to which they are entitled if it leaves them in a limbo that may affect their fundamental decision-making in this case. As to the Government's proposal, the

---

their conspiracy. It would be difficult, if not impossible, for the court to conduct the trial with requisite fairness and efficiency given this evidentiary conundrum.

[7] Under either the court's current pretrial order or the government's proposal, Defendants would be tried in small groups of approximately 6–8 defendants.

[8] In making its "related group" proposal, the Government suggests that it could recommend trial groupings based on its review of the evidence and attendant assessment of potential ties or common threads between individual defendants. But the rules at issue simply do not vest the Government with that kind of authority, and the individual defendants would invariably (and justifiably) balk at the Government's proposed groupings on due process and other grounds.

court does not believe that the time and resources necessary to allow dozens of defendants to argue about the proper break out of specific groups for trial is efficient or warranted. And regardless, such a proposal would not diminish the prejudicial effects on Defendants identified above.

While it may be inconvenient and require some additional effort to try Defendants separately, "our Government is not one of mere convenience or efficiency." *Kotteakos*, 328 U.S. at 773. In this case, such conveniences are outweighed by Defendants' right to a fair trial. Accordingly, although it need not rely on Rule 14 to order a severance given the court's finding that joinder is improper, the court would find severance appropriate under Rule 14 regardless of the propriety of joinder.

## V.

For the foregoing reasons, the court finds that Defendants have been improperly joined in the Indictment, and the court will order severance in the manner outlined by its January 10th Order. (*See* ECF No. 384.)

The Clerk is directed to forward a copy of this Memorandum Opinion to the parties.

**ENTERED** this 24th day of January, 2025.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE